## Case No. 8,938.

### MADISON & P. R. CO. v. WISCONSIN et al.[1]

Circuit Court, W. D. Wisconsin. Oct. 28, 1879.

RAILROAD LAND GRANTS—CONTINUITY OF LINE—SELECTION OF INDEMNITY LANDS—COTERMINOUS PRINCIPLE—ESTOPPEL AND FORFEITURE—OVERLAPPING GRANTS.

[1. By the act of June 3, 1856 (11 Stat. 20), lands (defined in the usual manner by grant and indemnity limits) were granted to the state of Wisconsin to aid in the construction of a railroad "from Madison or Columbus, by way of Portage City to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior and to Bayfield." Prior to May 5, 1864, the entire line was located, but none of it was constructed except the part between Portage and Tomah, a distance of 61 miles. On the latter date congress passed another act, which, in the first section, granted lands to aid in the construction of a railroad "from a point on the St. Croix river or lake, between townships 25 and 31, to the west end of Lake Superior," and from some point on that line to Bayfield. In the second section a grant was made for a railroad "from Tomah to the St. Croix river or lake, between townships 25 and 31. Held, that while the first act was probably intended to create one continuous road from Madison to the west end of Lake Superior and Bayfield, the later act unquestionably operated to break the continuity of this line at the St. Croix river, and create two separate roads; and hence that no deficiencies of lands within the grant limits of one road could be made up by selections from the indemnity limits of the other, unless a vested right thereto had accrued prior to the act of 1864.]

---

[1] [Not previously reported.]

[2. The act of 1856 provided, in the fourth section, that in disposing of the lands there should be sold in the beginning a quantity not exceeding 120 sections, to be included within a continuous length of 20 miles; and that when 20 continuous miles of road was completed, a like quantity might be sold. The act of 1864, however, provided, in section 7, that when 20 continuous miles of road were completed, patents might issue for the lands earned "on each side of the road, as far as completed, and coterminous with said completed section, not exceeding the amount" prescribed by the act. *Held*, that whatever might be the construction of the act of 1856, it was beyond question that, under the act of 1864, the selections of lieu lands must be made on the coterminous principle, and that a company constructing any given 20 miles of road could not supply deficiencies by selections from the indemnity limits along some other part constructed by a different company.]

[3. By the act of 1856, the "place" or "grant" limits were fixed at 6 miles on each side of the road, and the "indemnity" limits at 15 miles. Under the act of 1864, however, the place limits were 10 miles and the indemnity limits 12 miles, but from the lands thus granted there was to be "deducted" all the lands granted by the act of 1856, and no selections were to be made in lieu of lands granted by that act. The grant was to be "upon the same terms and conditions as are contained" in the act of 1856. *Held*, that the act of 1864 did not recognize and require the enforcement of the provisions of the act of 1856, as to all lands granted thereby, but rather it made a new grant, which included the lands to which no vested right had yet accrued under the previous act, together with enough additional lands to extend the place and indemnity limits to 10 and 20 miles, respectively, and then applied the coterminous principle to the whole.]

[4. A company which accepted from the state a grant of lands for the construction of the road from Tomah to the St. Croix river, upon the same conditions and restrictions as were imposed by the act of 1864, and also accepted from congress the benefit of a subsequent joint resolution extending the time allowed by that act for the completion of the road, as well as certificates from the governor showing the completion of two sections of the road, was, by these repeated recognitions of the act of 1864, estopped from claiming lands except upon the coterminous principle, and hence could assert no right to make up deficiencies by selecting lands beyond its terminal points, and within the limits granted to other companies, which had already commenced the work of construction under the act of 1864.]

[5. A company which accepted from the state a grant for the construction of part of the line upon condition that the same should be completed within a given time, but failed to fulfill the condition, for which reason a forfeiture was declared by the legislature, could not, merely by doing certain grading, have acquired any vested rights in the land such as would prevent the operation of the forfeiture.]

[6. The acceptance by the state of the grant made by the act of congress of 1864, with its condition requiring the lands to be disposed of upon the coterminous principle, operated of itself, and without any formal act of forfeiture, to cut off any claim to lands beyond the terminus of its own road made by a company which, prior to the act of 1864, had violated the conditions upon which the state had granted lands to it.]

[7. Under the acts of congress the grants were of sections of land in place, as they existed on the ground, so that if any of these sections were fractional, the state could not make up the deficiency from lands in the indemnity limits, because, as to the lands in place, the acts operate directly by specific description. But, where there were not lands in place to meet the calls of the grants, whether the deficiency were more or less, it was competent to supply it by sections from the indemnity limits; or, if there were parts of sections of the lands in place excluded from the grant by the terms of the acts, it was competent to supply the deficiency from the indemnity limits by a similar legal subdivision of land.]

[8. It seems that where contemporaneous grants are made to different companies, whose roads approach each other so that the grants overlap, such companies are to be regarded as tenants in common, without regard to which company first constructs its road.]

[This was a bill by the Madison and Portage Railroad Company against the treasurer of the state of Wisconsin, the West Wisconsin Railway Company, the Wisconsin Railroad Farm Mortgage Land Company, the North Wisconsin Railway Company, the Chicago, Portage & Superior Railway Company, and the Wisconsin Central Railway Company. Cross bills were filed by various defendants. The purpose of the litigation was to determine the conflicting claims of the various parties to certain lands granted by congress to the state of Wisconsin to aid in the construction of railroads in that state.]

HARLAN, Circuit Justice. By the first section of the act of congress, approved June 3, 1856, granting public lands to aid in the construction of railroads in the state of Wisconsin, there was granted to that state, "for the purpose of aiding in the construction of a railroad from Madison or Columbus, by way of Portage City, to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior and to Bayfield, and also from Fond du Lac, on Lake Winnebago, northerly to the state line, every alternate section of land, designated by odd numbers, for six sections in width, on each side of said roads respectively." "But," the act declares, "in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections or parts thereof granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tier of sections above specified, as much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption has attached as aforesaid, which lands (thus selected in lieu of those sold and to which pre-emption has attached as aforesaid, together with the sections or parts of sections designated by odd numbers as aforesaid and appropriated as aforesaid) shall be held by the state of Wisconsin for the use and purpose aforesaid; provided, that the lands to be so located shall in no case be further than fifteen miles from the line of the roads in each case, and selected for and on account of said roads; pro-

vided, further, that the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever; and provided further, that any and all lands reserved to the United States by any act of congress, for the purpose of aiding in any object of internal improvement, or in any manner for any purpose whatsoever, be, and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the route of said railroads through said reserved lands, in which case the right of way only shall be granted, subject to the approval of the president of the United States." The second section provides that the sections and parts of sections of land which, by such grant, remained to the United States, within six miles on each side of said roads, should not be sold for less than double the minimum price of the public lands when sold, nor should they become subject to private entry, until the same had been offered at public sale at the increased price. By the fourth section it is declared that the lands granted should not be disposed of by the state, except in the following manner: That a quantity of land not exceeding 120 sections, and included within a continuous length of 20 miles of roads, respectively, might be sold; and when the governor of the state should certify to the secretary of the interior that any 20 consecutive miles of either of said roads were completed, "then another like quantity of land" thereby granted might be sold, and so from time to time until the roads are completed. If the roads were not completed within ten years, the act provided that no further sales should be made, and the unsold lands should revert to the United States. The lands, rights and privileges thus granted were, on 8th October, 1856, formally accepted by the state upon the terms, conditions, and restrictions contained in the act of congress, and the state assumed and undertook the trust thereby created.

On 11th October, 1856, the state, by an act on that day approved [Gen. Acts Wis. p. 217], authorized the La Crosse & Milwaukee Railroad Company, a corporation created by the laws of Wisconsin, to construct and operate the roads described in the act of congress from Madison and Columbus, via Portage City, to St. Croix river and lake, and from thence to the west end of Lake Superior and to Bayfield; and for the purpose of aiding such construction the state granted to that company all its interest and estate, present and prospective, in or to the lands granted by the act of June 3, 1856, for the construction of the railroad between the points and along the routes just named, together with all the rights, privileges, and immunities conferred or intended to be conferred by the act of congress. Prior to May 5, 1864, no portion of the entire route from Madison, via Portage City and St. Croix river or lake, to the west end of Lake Superior and to Bayfield, had been completed, except the line between Portage and Tomah, a distance of 61 miles; that part of the line was constructed in the years 1857 and 1858, and ever since April, 1858, has been in use for freight and passenger trains.

On May 5, 1864 [13 Stat. 66], congress passed an act "granting lands to aid in the construction of certain railroads in the state of Wisconsin." Since the rights of parties to this litigation depend chiefly, if not altogether, upon the construction and effect which may be given to that act, it is necessary to refer at some length to its provisions. By the first section it is declared "that there be and is hereby granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from a point on the St. Croix river or lake, between townships 25 and 31 to the west end of Lake Superior, and from some point on the line of said road, to be selected by said state, to Bayfield, every alternate section of public land designated by odd numbers, for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin for the same purpose by the act of congress of June 3d, 1856, upon the same terms and conditions as are contained in the act granting lands to the state of Wisconsin to aid in the construction of railroads in said state, approved June 3d, 1856." "But," the act provides, "in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of any sections or parts thereof, granted as aforesaid, or that the right of pre-emption or homestead has attached to the same, then it shall be lawful for any agent or agents, to be appointed by said company to select, subject to the approval of the secretary of the interior, from the public lands of the United States nearest to the tier of sections above specified, as much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption or homestead has attached as aforesaid, which lands (thus selected in lieu of those sold, and to which pre-emption or homestead right has attached as aforesaid, together with sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by said state for the use and purpose aforesaid; provided that the lands to be so located shall in no case be further than 20 miles from the line of the said roads, nor shall such selection or location be made in lieu of lands received under the said grant of June 3d, 1856, but such selection and location may be made for the benefit of said state, and for the purpose aforesaid, to supply any deficiency under the said grant of June 3d, 1856." By the second section of the act, a grant in similar terms, and upon like condi-

tions as to the selection of lands in lieu of sections or parts of sections appearing, when the line or route of the road shall have been definitely fixed, to have been sold, reserved, or otherwise disposed of, was made to the state for the purpose of aiding in the construction of a railroad from Tomah to the St. Croix river or lake, between sections 25 and 31, of "every alternate section of public land designated by odd numbers, for ten sections in width on each side of said roads, deducting any and all lands that may have been granted to the state of Wisconsin, for the same purpose by the act of congress granting lands to said state to aid in the construction of certain railroads, approved June 3, 1856, upon the same terms and conditions as are contained in the said act of June 3, 1856." By the third section of the act, and upon like conditions as to the selection of lieu lands (except that no reference was made to deductions of lands granted by or received under the act of June 3, 1856), there was granted to the state, to aid in the construction of a railroad from Portage City, Berlin, Doty's Island, or Fond du Lac, as the state might determine, to Bayfield, and thence to Superior, on Lake Superior, "every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, upon the same terms and conditions as are contained in the act granting lands to said state to aid in the construction of railroads in said state, approved June 3, 1856." Section 4 declares that the sections and parts of sections of land remaining to the United States, within 10 miles on each side of said roads, shall not be sold for less than double the minimum price of the public lands when sold; nor should any of the said reserved lands become subject to private entry until the same shall have been first offered at public sale at the increased price. By section 5 it is provided that the time fixed and limited for the completion of the roads in the act of June 3, 1856, was extended to a period of five years from and after May 5, 1864. Section 6 is similar to the last proviso of section 1 of the act of June 3, 1856. By section 7 it was declared that, whenever there was "completed 20 consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, as far as the same is completed and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each 20 miles of said road is completed; provided, however, that no patents shall issue for any of said lands unless there shall be presented to the secretary of the interior a statement, verified on oath or affirmation by the president of said company, and certified by the governor of the

state of Wisconsin, that such 20 miles have been completed in the manner required by this act, and setting forth with certainty the points where such 20 miles begin and where the same end; which oath shall be taken before a judge of a court of record of the United States." The eighth section declares that the lands granted by that act shall, when patented as provided in the seventh section, be subject to disposal, for the purposes stated in the act, and for no other, and the railroads should be and remain public highways for the use of the government of the United States, free from all toll or other charge, for the transportation of any property or troops of the United States. The ninth and only remaining section provides that, if the road mentioned in the third section is not completed within 10 years from the passage of the act, as provided therein, no further patents should be issued to the company for such lands, no further sales should be made, and the lands unsold should revert to the United States.

On the 20th March, 1865, the lands granted by the act of May 5, 1864, were accepted by the state, "subject however, to all the conditions of said act of congress," and the state consented "to execute the said trust, created by the aforesaid act of congress, pursuant in all things, to the terms, limitations, and conditions of said act." The secretary of state of Wisconsin was required to transmit a certified copy of the resolution, showing such acceptance, to the secretary of the interior.

Recurring to the provisions of the act of June 3, 1856, it seems to be reasonably clear, that that act contemplated, or at any rate rendered possible, the construction, by one company, of a single continuous railroad from Madison or Columbus, via Portage City and St. Croix river or lake, to the west end of Lake Superior and to Bayfield. But the continuity of such line was destroyed, and in my opinion was intended to be destroyed, by the act of May 5, 1864. Instead of making an additional or increased grant for one entire line, as described in the act of June 3, 1856, from Madison or Columbus to Lake Superior, congress, in one section of the act of 1864, made a distinct grant for a railroad from a point on the St. Croix river or lake, between townships 25 and 31, to the west end of Lake Superior and to Bayfield; in another section, a distinct grant to aid in the construction of another railroad from Tomah to St. Croix river or lake, between townships 25 and 31; and, in a third section, a distinct grant for another and distinct railroad from Portage City, Berlin, Doty's Island or Fond du Lac, to Bayfield, thence to Superior. If congress had intended to give additional lands for the benefit of the same or a single and continuous line from Madison or Columbus, via St. Croix river or lake, to the west end of Lake Superior and to Bayfield, as described in the act of June 3, 1856, that result could have been effected

by an amendment of that act, simply extending, for the benefit of the line therein described, and which had then been formally located, the place limits to 10 miles and the indemnity limits to 20 miles. But, instead of adopting that course, it made a specific grant, in separate sections, for distinct roads between designated terminal points, without requiring the parties or companies constructing those several lines to adopt the line or route which may have been located under or by virtue of the act of June 3, 1856. This course was, perhaps, suggested by the fact, of which we may presume congress had knowledge, that nearly eight years had elapsed after the state's acceptance of the act of June 3, 1856, without anything whatever being done upon the line, west and north of Tomah, beyond the mere location of the route from Tomah, via St. Croix river or lake, to Lake Superior. But, whatever considerations may have influenced congress we are satisfied that the purpose of the act of May 5, 1864, was to break the continuity of the original line from Tomah, via St. Croix river or lake, to the west end of Lake Superior and to Bayfield, and devote to the construction of separate and distinct portions of that line an increased quantity of lands beyond the amount granted by, or which could have been made available under the act of 1856.

An important question arising upon the construction of the acts of 1856 and 1864 is, whether the act of 1864 provides for the disposal of the granted lands upon a principle or by a rule different from that prescribed in the act of 1856, and, further, whether that of 1864 has not practically, and without violating any of the rights of the parties to this cause, superseded the essential portions of the act of 1856. Touching the act of June 3, 1856, some of the counsel insist that the lands, which by that act were allowed to be selected in lieu of lands appearing to have been previously sold or otherwise appropriated by the government, or the lands earned by the construction of each 20 continuous miles, could have been located anywhere along the entire line from Madison, via Portage and St. Croix river or lake, to the west end of Lake Superior and to Bayfield, and that the selection of such lands was not by that act limited to the public lands coterminous with any completed section of 20 miles and within 15 miles of the line of road. Without stopping now to inquire how far that construction of the act of June 3, 1856, is maintained by some of the adjudged cases, or by the action of any department of the government, it is quite certain that the act of May 5, 1864, admits of the disposal of the lands therein granted only upon the coterminous principle. Upon the completion of 20 consecutive miles in the manner required for a first class railroad, and upon the fact of such completion being certified by the governor, and sustained by affidavits,

presented to the secretary of the interior, patents could issue for the lands earned in the construction of such twenty continuous miles. But the statute, in language too explicit to admit of doubt, or to require construction, declares that the patents shall convey the right and title to such earned lands to the companies entitled thereto, "on each side of the road, as far as the same is completed, and coterminous with said completed section, not exceeding the amount" prescribed in the act. According to the act of 1864, patents for lands earned in pursuance of its provisions could issue only to the companies constructing the roads described in the act, or to the companies to whom the benefit of the grant might be transferred.

It is, however, contended with much earnestness that the act of 1864, so far from repealing or modifying the act of 1856, recognizes and requires the enforcement of its provisions as to all lands covered by the grant therein contained. But, in my opinion, this position is unauthorized by anything contained in the act of May 5, 1864, and is inconsistent with the evident intention of congress in making distinct grants for the several roads designated in that act. The grant is of "every alternate section of public land designated by odd numbers for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin for the same purpose by the act of congress of June 3, 1856, upon the same terms and conditions as are contained in the act granting lands to the state of Wisconsin to aid in the construction of railroads in said state, approved June 3, 1856." It certainly was not the intention of congress, by the act of May 5, 1864, to grant to the state every alternate odd section "for ten sections in width on each side of said road," in addition to the alternate odd sections "for six sections in width on each side" of the roads, granted by the act of June 3, 1856. The purpose of the act of May 5, 1864, was, as to the several roads therein described, to grant the alternate odd sections for 10 sections in width in place of odd alternate sections for six sections in width granted by the act of June 3, 1856; and instead of indemnity limits for 15 miles, as provided in the last named act, to allow selections of lands within 20 miles of the located line. If, within the place limits, as established and rendered certain under the act of 1864, either by the location of a new route or by the partial adoption of the route located under the act of 1856, there should be found lands within the place limits, as established under the act of 1856, the title to which had not been earned or become vested, it was intended that such lands be taken as a part of the place limits under the act of 1864, and not in addition to the alternate sections for 10 sections in width granted by the act of 1864. That is manifestly what was meant by the requirement that the

lands granted by the act of 1856 should be deducted from the alternate odd sections for 10 sections in width granted by the act of 1864. This construction is fortified by the first proviso of section 1 of the act of 1864, which declares that the lands to be located in lieu of lands which had been sold or appropriated by the government, and which, therefore, could not be used to aid in constructing the railroad, should not be made "in lieu of lands received under the said grant of June 3, 1856," but that such location might be made to supply any "deficiency" under the grant of June 3, 1856. That is to say, lands granted by the act of 1856, if found, upon the definite location of the respective roads under the act of 1864, to be within the place limits defined by the latter act, were not to be regarded as having been previously appropriated by congress, so as to entitle the company constructing the road under the act of 1864, to claim other lands in lieu thereof, but they were to be taken as a part of the "ten sections in width" granted by the act of 1864. It was, therefore, to be deducted from the affirmative grant of 10 sections in width, made in 1864. The word "deducting" was not, perhaps, the very best one to express the intention of congress, but that congress intended what I have indicated is reasonably clear.

If we are correct in our construction of the act of May 5, 1864, it follows that the lands coterminous with each completed section of 20 consecutive miles of the respective roads, described in and granted by that act, were exclusively for the benefit of the respective companies who should, under the provisions of that act, construct each completed section of 20 miles, and that no one of the companies constructing a road under that act could, for any deficiency of lands coterminous with its own line, supply such deficiency out of lands coterminous with other lines constructed by other companies under the same act. In other words, congress intended that all the lands granted by and earned under the act of May 5, 1864, by means of constructed road, should be disposed of according to the coterminous principle.

It results, also, from what has been said, that its acceptance of the grant of May 5, 1864, subject to all the conditions prescribed in the act of congress, and its agreement to execute the trust therein created by congress, "pursuant in all things to the terms, limitations, and conditions in said act," binds the state to an administration of the grant upon the coterminous theory, unless rights had previously accrued under and by virtue of the act of June 3, 1856, which congress could not, even with the consent of the state, ignore or violate, or unless, subsequent to the passage and acceptance of the act of 1864, the state, with the consent of congress or in harmony with its legislation, recognized in some binding form the rights growing out

of the act of June 3, 1856. Whether any of the parties to this litigation have any such rights, or whether any of them can object to the administration of the grant upon the principles enumerated in the act of May 5, 1864, we now proceed to inquire.

Before considering the exact status at the time of the passage of the act of May 5, 1864, of the several parties to this litigation, it is necessary to state somewhat in detail all that had been accomplished between the date of the passage of the act of June 3, 1856, and prior to the passage of the act of May 5, 1864. We have already referred to the act of October 11, 1856, whereby the state conferred the grant of June 3, 1856, upon the La Crosse & Milwaukee Railroad Company. From the act of October 11, 1856, it appears that the title to the lands granted by the act of June 3, 1856, was not to vest or be subject to disposal except upon the completion of each section of 20 consecutive miles, and that the company was prohibited from making sales exceeding six sections of land for every mile of road completed; that the La Crosse & Milwaukee Railroad Company agreed to complete the entire road from Madison and from Columbus, via Portage City, to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior and to Bayfield, within 10 years from June 3, 1856, and to complete those portions between Madison and Portage City, and between Columbus and Portage City, simultaneously, as nearly as practicable, and by December 31, 1858; that in case the company should violate the provisions of the act of October 11, 1856, the legislature of Wisconsin might repeal that act, and might revoke the rights and franchises therein conferred, so far as the same had not been performed and fulfilled, and so far as the rights and privileges thereby granted had not become complete and absolute. The La Crosse & Milwaukee Railroad Company promptly accepted the grant, lands, rights, and privileges conferred by the act of October 11, 1856, upon the terms, conditions, and restrictions therein contained. On 31st December, 1856, the company executed to Bronson and others, as trustees, a deed of trust or mortgage, containing the usual provisions, covering all the property which then constituted, or might thereafter constitute or be a part of the road of the grantor from Madison, by way of Portage, to St. Croix river or lake, between townships 25 and 31, and from Portage to La Crosse, to secure bonds amounting to $10,000,000 proposed to be issued for the construction of said roads, including all lands granted or intended to be granted to that company, so far as the same pertained or were applicable to the construction of the road from Madison, by way of Portage, to the St. Croix river or lake, and also all the property which the company might thereafter acquire, as fully and amply

as the same might or could be conveyed if the roads had then been fully constructed and completed, and also the particular lands granted by the acts of June 3, 1856, and October 11, 1856, so far as the same were applicable to the construction of the road from Madison to St. Croix river or lake. Subsequently, on March 6, 1857, the La Crosse & Milwaukee Railroad Company was authorized by an act of the legislature of Wisconsin [Priv. & Loc. Laws Wis. p. 780] to transfer and convey to the St. Croix & Lake Superior Railroad Company all its right, title, and interest in the lands theretofore granted to it by the state which lie north of a point of intersection with St. Croix river or lake, upon the making of which conveyance the grantee should possess all the rights, powers, and privileges in regard to the construction of the road from such point of intersection to the west end of Lake Superior, and to Bayfield, and in regard to the application and disposal of such lands, which had been conferred upon the grantor company by said act of October 11, 1856, and the grantor company, from the date of such conveyance, should be exonerated from all liability or duty as to the construction of that portion of the original line north of the St. Croix river or lake. On 10th March, 1857, the La Crosse & Milwaukee Railroad Company executed to the St. Croix & Lake Superior Railroad Company the conveyance authorized by the act to which reference has just been made. It contained, however, this clause: "But it is hereby expressly understood between the parties hereto that the said La Crosse & Milwaukee Railroad Company possesses and does not surrender or release the right of selecting any lands within 15 miles of and more than 6 miles from the route of the said road or roads between the St. Croix river or lake and the west end of Lake Superior, and also between the said route and Bayfield, for the purpose of making up any deficiency which does or may exist in the quantity of lands to which the said La Crosse & Milwaukee Railroad Company is or may be entitled upon that point (part) of its line extending from Madison to the St. Croix river or lake." By the same instrument the St. Croix & Lake Superior Railroad undertake to construct the designated roads, north of St. Croix river or lake, to the west end of Lake Superior and to Bayfield, within 10 years after June 3, 1856.

Following chronologically as far as possible, the history of the events as they transpired and were connected with the proposed lines of road, we find that on 2d August, 1858, there was certified to the governor of Wisconsin the completion, by the La Crosse & Milwaukee Railroad Company, of 20 additional miles westward from Portage City, making 61 continuous miles from that city westwardly to Tomah, in the direction of St. Croix river or lake, so as to admit

of the running of regular trains, both freight and passenger. But on 23d July, 1858, the governor refused to certify the same to the secretary of the interior, placing his refusal upon the ground that the conditions upon which the grant was made by the state to the company had not been complied with, in that the company had not built any road from Madison and from Columbus to Portage, simultaneously or at all, while both of such roads—from Madison to Portage, and from Columbus to Portage—were to have been completed by December 31, 1858. After the location of the line from Madison to Portage in June, 1857, and prior to 1861, the La Crosse & Milwaukee Railroad Company partially graded portions thereof, expending from $50,000 to $75,000.

By an act of the legislature of Wisconsin approved April 12, 1861 [Priv. & Loc. Laws Wis. 1861, p. 333], the Sugar River Valley Railroad Company was authorized to build and operate a railroad from Madison and the village of Columbus, on the most direct and feasible routes, to Portage,—both roads to be completed simultaneously, as near as practicable, and to be completed by December 31, 1863. For the purpose of aiding in the construction of such roads, there was granted to that company all the interest and estate, then present and prospective, of the state, in and to so much of the lands granted by the United States to Wisconsin by the act of June 3, 1856, as was or could be made applicable to the construction of that part of the railroad described in said last-named act, lying between Madison and Portage, together with all the rights, privileges, and immunities conferred or intended to be conferred by the act of congress, as to so much of said grant of land. The act provided for the acquisition of title to the land by the company, in the same mode and upon the same conditions substantially as prescribed in the act of October 11, 1856, in relation to the La Crosse & Milwaukee Railroad Company. That act provides also that, in case the Sugar Valley Railroad Company should construct their road, or any part of it, upon or over any route upon or over which any other railroad company was authorized to construct a railroad, or upon or over which it had, prior to that date, actually surveyed or located its line of railroad, then it should be the duty of the Sugar Valley Railroad Company to settle with such railroad company, upon principles of justice and equity, for all the property and rights of property which it should take, injure, or destroy, and pay therefor whatever it should be reasonably worth; that in case the company should fail to expend at least $50,000 in the construction of said road within one year, or should fail to complete the road from Madison to Portage, so as to admit of the running of regular trains upon the same by December 31, 1863, or should otherwise violate the provisions of said act of April 12, 1861, the legis-

lature might repeal the same, and revoke and annul all the rights and franchises therein conferred upon said company, so far as the same had not been performed and fulfilled, and so far as the rights and privileges granted had not become complete, absolute, or vested; that so much of the act of October 11, 1856, and so much of the grant of lands thereby granted to the said La Crosse & Milwaukee Railroad Company as were or could be made applicable to the construction of a railroad from Madison to Portage, and from Columbus to Portage, and all the rights, privileges, and franchises thereby .conferred, granted, and conveyed to and upon the La Crosse· & Milwaukee Railroad Company, so far as the roads from Madison to Portage, and from Columbus to Portage, and the lands granted to aid in the construction of the same were concerned, were thereby repealed, revoked, annulled, and declared void. In January, 1862, a decree of foreclosure and sale was rendered in the district court of the United States for the district of Wisconsin, of the trust deed executed by the La Crosse &. Milwaukee Railroad Company to Bronson and others. The sale under this decree took place April 5, 1863, the purchasers being William Wallace and William H. White. On the 20th January, 1863, the Sugar Valley Railroad Company failed, suspended payment, and practically closed all operations on the line between Madison and Portage, but prior to that date it had expended for grading and in acquiring the right of way about $40,000.

By an act approved 1st April, 1863 [Supp. Loc. & Priv. Laws Wis. 1863, p. 47], the Tomah & Lake St. Croix Railroad Company was incorporated, with authority to build and operate, on such route or from such point as the directors should determine in Tomah, on the track of the Milwaukee & La Crosse Railroad, or any other railroad running out of Tomah (that being the point westward of Portage City to which the 61 miles of road from Portage City, constructed in 1857 and 1858 by the La Crosse & Milwaukee Railroad Company extended), by way of Black River Falls, thence by the most feasible route to such point on Lake St. Croix, between townships 25 and ·31, as the directors should determine. For the purpose of aiding in the construction of said railroad there was granted to that company all the interest and estate, then present and prospective, of Wisconsin in and to so much of the lands granted by the United States by the act of June 3, 1856, as was or could be made applicable to the construction of that part of said railroad lying between the village of Tomah and Lake St. Croix, together with the rights, privileges, and immunities conferred or intended to be conferred by said act of June 3, 1856, as to so much of said grant, the title to the lands thus granted to vest in the same mode and upon the same conditions, substantially, as those prescribed in reference to the La Crosse & Milwaukee Railroad Company

by the act of October 11, 1856. The act further provided that so much of the act of October 11, 1856, and so much of the grant thereby of lands to the La Crosse & Milwaukee Railroad Company as was or could be made applicable to the construction of a railroad from Tomah to Lake St. Croix, and all the rights, privileges, and franchises thereby conferred, granted, and conveyed to the said La Crosse & Milwaukee Railroad Company, so far as the road from Tomah to St. Croix, and the lands therein granted to aid in the construction of the same, were concerned, were thereby repealed, revoked, annulled, and declared void. On the 5th May, 1863, Wallace and White received a deed from the marshal, and upon the same day organized a corporation under the name of Milwaukee & St. Paul Railway Company, to which was conveyed, by the decretal purchasers, among other things, the lands granted or intended to be granted to the La Crosse & Milwaukee Railroad Company by virtue of the acts of June 3, 1856, and October 11, 1856, so far as lands pertained or were applicable to the construction of the roads from Madison, by way of Portage, to the St. Croix river or lake. By an act approved March 31, 1864 [Gen. Laws Wis. 1864, p. 349], the St. Croix & Lake Superior Railroad Company was authorized and empowered to preserve and protect the timber growing or being upon any of the lands theretofore granted by congress to the state of Wisconsin by the act of June 3, 1856, and "which are situated within fifteen miles of the located line of such company's railroad."

We have now stated, so far as we have been able to collect them from the immense mass of papers before us, the important facts in connection with the lines of railroad between Madison, via Portage and St. Croix river, to the west end of Lake Superior and to Bayfield, which transpired between the passage of the act of June 3, 1856, and the acceptance by the state of the act of 5th May, 1864. At the date last named, as we have shown, no part of the line between Madison and Portage had been constructed. Nothing had been done, except to locate and partially grade the lines between those points. The company charged with the duty of completing the road from Madison to Portage by December 31, 1863, had, prior to May 5, 1864, failed and suspended operations, and was in suspension at the last-named date. Between Tomah and St. Croix lake, and between St. Croix lake and the west end of Lake Superior and Bayfield, nothing whatever had been done in the way of construction prior to May 5, 1864. The respective companies seeking or claiming the benefit of, or operating under, the grant of June 3, 1856, had done substantially nothing between Tomah and Lake Superior beyond locating their lines on the designated routes.

Returning to the inquiry whether the acceptance by the state of the provisions of the

act of May 5, 1864, was inconsistent with any rights which then belonged to the predecessors in interest of the parties to this cause, let us first examine the case as to

The West Wisconsin Railroad Company,

Formerly the Tomah & Lake St. Croix Railway Company. It seems to be clear that that company, at least, is not in any position to object to the administration of the congressional grant upon the coterminous principle. It would seem to be estopped, upon every principle of equity, from asserting any claim to supply its deficiency of land, if any such exists, out of lands beyond its line and along the road constructed and to be constructed by other companies north of its line and between St. Croix river or lake and Lake Superior. The state, by an act approved March 29, 1865, conferred upon that company the benefit of the increased grant, and, among other things, all and singular the rights, privileges, and interests conferred and bestowed upon the state by the act of May 5, 1864, including the privilege given by that act as to the extension of time for building the road from Tomah to St. Croix river or lake between townships 25 and 31. The company accepted the grant upon the same conditions and restrictions as were imposed by congress upon the state in the act of 1864. Besides, it accepted from congress, by joint resolution approved July 13, 1868, a further extension of three years for the completion of its road beyond the time limited by the act of 1864. It accepted and caused to be filed with the secretary of the interior a certificate from the governor of the state, dated September 10, 1870, showing that the first 80 miles constructed by it had been built and completed in the manner required by the act of May 5, 1864. It accepted and caused to be filed a similar certificate as to another section of 20 continuous miles. After these repeated recognitions of the act of May 5, 1864, after accepting the benefits, the extension of time, and all the privileges given by that act and by the act of 1868, it should not be heard to claim lands beyond its terminal points and within the limits granted to other companies who have entered upon the work of construction under the authority and upon the faith of the act of May 5, 1864. If, as claimed, the North Wisconsin Railroad Company, which is engaged in constructing the road from St. Croix lake or river to Bayfield, has received grants of land in violation of the coterminous principle prescribed in the act of May 5, 1864, that is a matter between the state or the United States and that company, of which the West Wisconsin Railroad Company may not complain. And so if the West Wisconsin Railroad Company has, as urged, received lands along or opposite to its line which it had no lawful right to receive under the act of 1864, that is not a matter to be corrected in this litiga-

tion, or of which other companies can complain under the present issues, provided such other companies were not themselves entitled to the lands thus alleged to have been illegally appropriated and received by the West Wisconsin Railroad Company. As to whether it has, in fact, received patents for lands to which it was not entitled, the court expresses no opinion. Its decision upon the claim of the West Wisconsin Railway Company is restricted to the single point that it cannot supply its alleged deficiency out of the lands north of St. Croix river or lake, and beyond its own terminal points, whether such lands are claimed by the North Wisconsin Railway Company, the Chicago, Portage & Superior Railway Company, or the Wisconsin Central Railway Company.

Madison & Portage Railway Company.

Our next inquiry relates to the claim of the Madison & Portage Railway Company to supply its alleged deficiency from lands north of St. Croix river or lake. We have already seen that the rights, privileges, and franchises conferred in 1856 upon the La Crosse & Milwaukee Railroad Company, so far as the roads from Madison to Portage, and from Columbus to Portage, and the lands granted to aid in the construction of the same, were concerned, were, in the year 1861, revoked, annulled, and declared void by the state. The right of the state to make such revocation cannot well be disputed in view of the reservations in the act of October 11, 1856, and the failure of the La Crosse & Milwaukee Railroad Company to complete such roads by the time stipulated in that act, viz. December 31, 1858. What the La Crosse & Milwaukee Railroad Company may have previously done upon the line between Madison and Portage, in the way merely of grading, did not create any rights in its favor against the state or against the United States, certainly no rights that were complete or absolute, or which prevented the state, in 1861, from recalling its grant to that company. We have also seen that, in the statute of 1861, declaring such revocation, the right to construct the road from Madison to Portage was conferred upon the Sugar Valley Railroad Company, together with the lands, privileges, and immunities, as to that part of the original line, which had been previously conferred upon and granted to the La Crosse & Milwaukee Railroad Company. But the Sugar Valley Railroad Company (the predecessor of the Madison & Portage Railroad Company) did not comply with the terms of the said act of 1861. It did not, as it expressly agreed to do, expend upon its road, within one year from the passage of the act, the sum of $50,000; nor did it, by December 31, 1863, complete the road from Madison to Portage so as to admit of the running of regular trains upon the same, or at all. On the contrary, as early as January 26, 1863, it failed, suspend-

ed payment, and practically closed all operations on its road. It had not resumed operations when the act of May 5, 1864, was passed, or when its provisions were accepted by the state. It had not, at either date, acquired any right which was "complete, absolute, or vested." It was in a position where the state, by virtue of the reservations of power contained in the act of 1861, could revoke all the authority conferred upon it, including the right to earn lands as compensation or bounty for constructed road. Its violation of the act of 1861, in the particulars named, authorized the state, at the time of its acceptance of the act of May 5th, 1864, to repeal the act of 1861, and revoke the grant thereby made. The state did not, so far as I can find in the record, formally exercise such right of repeal and of revocation, but it did, on 20th March, 1865, as it might lawfully have done, that which was practically equivalent to a revocation of the rights granted in the act of 1861; that is to say, it agreed with the United States to execute the trust, created by the act of 1864, pursuant, in all things, to the terms, limitations, and conditions of that act—an agreement which, we have seen, required the disposal, according to the coterminous principle, of all the lands granted by the act of 1864 among the several companies constructing, under the sanction of its authority, each continuous 20 miles. That agreement embraced all the lands beyond or northwest of Tomah, and as far north as Lake Superior, and was inconsistent with any right in the Sugar Valley Railroad Company thereafter to earn and appropriate lands beyond its own line and within the limits, terminal and lateral, prescribed by the act of May 5, 1864. If it was competent for the state, on March 20, 1865, as it unquestionably was, to revoke the grant of 1861 to the Sugar Valley Railroad Company, it was equally competent, without a formal revocation of such grant, to stipulate with the United States that it would dispose of the lands granted and received under the act of 1864 according to the terms therein prescribed. If we are correct in this view, it results that no action of the state, subsequent to March 20, 1865, continuing in force the grant of 1861 to the Sugar Valley Railroad Company, or substituting the Madison & Portage Railroad Company to the enjoyment of the rights originally conferred upon the Sugar Valley Railroad Company, could affect its obligation to the United States to respect and execute the provisions of the act of May 5, 1864. It is enough for the disposition of the claim of the Madison & Portage Company that the Sugar Valley Railroad Company had no substantial right, on March 20, 1865, which prevented the state from agreeing to execute the trust created by the act of May 5, 1864, pursuant, in all things, to its provisions, including the provision which declared the coterminous principle. The effect of the act of May 5, 1864, and of its acceptance by the state, so far as the Sugar Valley Railroad Company or its successor was concerned, was to protect or withdraw the lands described in that act from any claim of that company on account of deficiency lands to which they might become entitled by actual construction of road, at a subsequent date, under the grant of June 3, 1856.

### Wisconsin Railroad Farm Mortgage Land Company.

We will now consider the case of the Wisconsin Railroad Farm Mortgage Land Company, which claims to be the successor of the La Crosse & Milwaukee Railroad Company as to all rights accruing upon the construction of the 61 miles of road between Portage and Tomah in the years 1857 and 1858. It will be remembered that the La Crosse & Milwaukee Railroad Company, on the 10th March, 1857, under authority conferred by the state, transferred to the St. Croix & Lake Superior Railroad Company the right to construct the original line north of St. Croix lake or river, and such benefits and privileges as were connected with the grant contained in the act of June 3, 1856. The indenture between the parties contained, as has been seen, an acknowledgment that the La Crosse & Milwaukee Railroad Company then possessed and did not surrender or release the right to select lands within 15 miles of, and more than six miles from, the route of the roads north of St. Croix river or lake to supply any deficiency which then existed or might thereafter exist in the quantity of lands to which the La Crosse & Milwaukee Railroad Company was or might be entitled upon that part of its line extending from Madison to the St. Croix river or lake. It does not appear that the state previously assented to or contemplated such an arrangement between the parties. But, waiving any consideration of its validity because of the absence of such assent, it is clear that the state, after its acceptance of the act of 1864, and before the date of its grants to the North Wisconsin Railroad Company, the Chicago & Northern Pacific Air Line Railway Company, and Wisconsin Central Railway Company, conferred upon the Wisconsin Railroad Farm Mortgage Land Company the benefit of the reservation contained in the contract and indenture of March 10, 1857. The purchasers at the decretal sale of the rights and interests conveyed by the mortgage to Bronson and others, by apt and sufficient words, conveyed and transferred to the Milwaukee & St. Paul Railroad Company before the passage of the act of May 5, 1864. Although that company necessarily took subject to the right of appeal and revocation reserved to the state in the charter of the La Crosse & Milwaukee Railroad Company, and was, therefore, for the reasons already stated, in no position to object to the state's accepting and agreeing to execute the provisions of the act of May 5,

1864,—the state not having previously assented to the contract and reservation contained in the indenture of March 10. 1857,—we find that, as early as the year 1868, the state agreed that the farm mortgagors might have the benefit of any claim to the lands donated by congress which the Milwaukee & St. Paul Railroad Company had acquired, as the successor of the La Crosse & Milwaukee Railroad Company, on account of the construction of the road from Portage to Tomah. If, without the consent of congress, no such claim was maintainable under the act of June 3, 1856, nevertheless in 1868 congress authorized the legislature to dispose of the lands granted, and which might have accrued and been certified to the state, under the act of June 3, 1856, to aid in the construction of the road from Madison or Columbus, via Portage, to St. Croix river or lake, for the benefit of the Wisconsin Railroad Farm Mortgage Land Company. We find also that the legislature of Wisconsin, by an act approved March 23, 1872, declared the Wisconsin Railroad Farm Mortgage Land Company to be the legal successor (as to the rights acquired and conferred in and to a portion of the lands granted by congress to the state of Wisconsin by an act approved June 3. 1856) of the La Crosse & Milwaukee Railroad Company, as fixed and reserved in and by the contract entered into by and between the La Crosse & Milwaukee Railroad Company and the St. Croix & Lake Superior Railroad Company, executed March 10, 1857, and duly filed in the office of the secretary of state of Wisconsin. The act directed the governor to carry out the provisions of that contract, and conveyed to the Wisconsin Railroad Farm Mortgage Land Company, out of the lands granted by the act of June 3, 1856, such quantity of lands as had been or thereafter might be made applicable thereto, as should make, together with the lands theretofore conveyed to that company, the exact number of 6 sections for each mile of the railroad constructed by the La Crosse & Milwaukee Railroad Company from Portage to Tomah, a distance of 61 miles. At the same time, or on the day previous, the acts conferring the grants of June 3, 1856, and May 5, 1864, upon the St. Croix & Lake Superior Railroad Company were repealed, but with the proviso that nothing therein should be construed to impair the rights of the Wisconsin Railroad Farm Mortgage Land Company to the grant of June 3, 1856. Congress and the state seem to have concurred in desiring to provide full· compensation in lands to the Farm Mortgage Company for the 61 miles of road constructed and in use long prior to 1864. Such was the unfulfilled engagement of the state to that company when, in 1874, to the North Wisconsin Railway Company and the Chicago & Northern Pacific Air Line Railway Company was granted the right, title and interest which the state then had or might thereafter acquire in the lands granted by the acts of

June 3, 1856, and May 5, 1864, to aid in the construction of the roads north of St. Croix river or lake. The two companies, it is clear, took their grants with the knowledge that the state had, by a previous act, directed the governor to execute the contract of March 10, 1857, which expressly recognized the right of the La Crosse & Milwaukee Railroad Company to supply any deficiency south of St. Croix river or lake out of lands north of that river or lake. It seems to me, therefore, that, recognizing the right of the state to accept the grant of May 5, 1864, without doing violence to the then existing rights of any of these companies, or of their predecessors, it yet became bound by its subsequent ratification of the contract of March 10, 1857, before the date of the grants to the North Wisconsin Railroad Company and the Chicago & Northern Pacific Air Line Railway Company, to grant to the Wisconsin Railroad Farm Mortgage Land Company, out of the lands north of St. Croix river or lake, a quantity sufficient to satisfy its claim for the construction by its recognized predecessor of the 61 miles of road between Portage and Tomah. The claim of the Wisconsin Railroad Farm Mortgage Land Company related to road constructed south of Tomah, and neither that company nor its predecessor was required to accept the provisions of the act of 1864. That part of the line described in the original act was not embraced by or referred to in that act, for the reason, doubtless, that it had in fact been constructed before its passage. It was, therefore, left under the operation of the act of June 3, 1856. And even if that act did not require deficiency lands to be selected upon the coterminous principle, it was competent for the state, in view of the action of congress, after accepting the act of 1864, and before conferring the grant therein contained upon the North Wisconsin and Chicago & Northern Pacific Air Line Railway Company, to allow the Farm Mortgage Land Company to select the deficiency lands earned by its predecessor for constructed road out of such of the lands north of St. Croix lake or river as were embraced in the indemnity limits prescribed by the act of June 3, 1856. This it did by an express approval in 1872 of the contract of May 10, 1857, and by requiring the governor to carry it into effect. I am of opinion that the right thus recognized by the state should be enforced; but in giving effect to the claim of the Wisconsin Railroad Farm Mortgage Land Company it is not necessary, I think, to disturb the location of lands already made by the North Wisconsin Railroad Company. Upon this particular point, however, no final decision is now made. The Farm Mortgage Company was not entitled to any specific sections of land, and its claim can doubtless be satisfied without disregarding the selection or location of lands by the North Wisconsin Railroad Company for road constructed. But in this respect

the rights of those two companies can be more satisfactorily determined after a report by the master, to be hereafter made; and, until the coming in of that report, the court also reserves for determination the right of the several parties other than the West Wisconsin Railroad Company and the Madison & Portage Railroad Company in the fund spoken of in argument as the trespass fund.

Some question has been made as to the precise extent of the grant under the two acts of congress. We understand that it covers 6 sections in width on each side of the line in the one case, and 10 sections in the other, of lands in place as they existed on the ground, so that if any of these sections were fractional, or from any cause were not full sections, the state could not make up the deficiency from lands in the indemnity limits, because as to the lands in place the act operates directly by specific description, but, when there was not land in place to meet the call of the grants, whether the deficiency was more or less, it was competent to supply it by sections from the indemnity limits; or if, as might happen, there were parts of sections of the lands in place excluded from the grants by the terms of the acts, it was competent to supply the deficiency from the indemnity limits by a similar legal subdivision of the land. It would seem to be impracticable to administer the trust on any other basis. In supplying deficiencies it must be by sections, whether full or fractional, and by legal subdivisions. Deficiencies in place limits, caused by sales or pre-emptions previous to the location of routes, whether before or after the passage of the acts, may be supplied from the indemnity limits.

Although the Wisconsin Central Railroad Company has filed no cross bill, and has only presented its claims by answer, it may not be improper for us to express an opinion upon the effect of the grant by the act of 1864, when there is a conflict or overlapping of lands granted to the different railroads as they approach Lake Superior, large quantities of land being thus granted by the act to different roads. These grants are made by the same law operating on the lands granted at the same time. The Wisconsin Central Railroad has completed its road to Ashland, on Lake Superior, a point not named in the act, but up to the present time no road has been finished to Bayfield or to the west end of Lake Superior, and, without foreclosing the parties upon this question, we should be inclined to think that the different companies, as to all lands overlapping in the respective grants, must be considered tenants in common, without regard to priority of construction.

I am not sure that I have touched upon every point in this complicated cause which is essential to the determination of the rights of parties, nor am I quite sure that the recital of facts contained in this opinion is in all respects full and accurate. It would have been gratifying to me to have had more time than has transpired since the conclusion of the oral argument for the examination of the record and the consideration of the many difficult questions suggested by counsel. But the interests of parties seem to require an early disposition of the cause, and I have not felt at liberty to postpone an announcement of my conclusions to such a time as would give me all the opportunity for careful deliberation which the large interests involved seemed to demand. I have been the more willing to pursue this course since counsel concurred in stating that the cause, however decided in this court, would be taken to the supreme court of the United States for final determination. Upon the filing of this opinion in court, counsel will prepare an order dismissing the bill of complainant and the cross bill of the West Wisconsin Railroad Company, and referring the cause to the special master with such directions as are consistent with this opinion, and as will facilitate the final determination of all the remaining issues.

[An appeal was taken in this case to the supreme court of the United States, but was dismissed by stipulation of counsel on April 8, 1864.]